The Honorable the Pledges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention for the court is now sitting. God save the United States and this honorable court. Be seated please. All right, the first case we're going to hear this morning is Billard versus Charlotte Catholic High School and because of conditions we have Mr. Block arguing remotely. I guess you can see him on the screen and he will argue second so we'll begin with Mr. Goodrich, right? Yes, your honor. All right. Thank you, your honor. May it please the court, Luke Goodrich on behalf of the Diocese of Charlotte. The Supreme Court has repeatedly recognized what it calls the critical and unique role of teachers in religious schools. This is because religious schools like Charlotte Catholic exist not just to transmit academic knowledge but to pass on the faith to the next generation. Counsel, can I ask you sort of a special question related to that? Why isn't this a ministerial exception case given all of that? You're asking us to make new law but that's the doctrine we usually use to address, you know, that exact sort of set of concerns you just raised. Sure, your honor. We stipulated that we wouldn't raise the ministerial exception. Why not? Because you want us to issue a broader ruling? No, your honor. We stipulated to that in trial court in order to narrow the scope of discovery. It was on the on the eve of Bishop Jugas's deposition which, as you know, is deeply entangling. We wanted to limit the topics that were at issue there. The stipulation was also made before Bostock was decided, before Our Lady was decided in the Supreme Court, so the law shifted. But now that Our Lady has been decided, I guess I'm wondering why, you know, given the way the court has defined the exception and the reasons behind it, why we don't sort of have to start with that. A bunch of courts have held that right, that this is not a waivable defense. You're correct. Several courts have held it's not waivable. We're abiding by the stipulation that we made. We're not asserting the ministerial exception as a defense. There are several statutory defenses here that are... I don't quite understand and view that question. I have the very same question and it seems to me after Our Lady, the court seemed to suggest that it's not limited to people who just teach religion or are actual ministers ordained, but that it has a broader scope. Now it's sort of ill-defined, but it seems to me either you could take the position that the ministerial exception is but an aspect of the autonomy doctrine and that it's broader than just the ministerial, which I think is the general acceptance by people who are specialized in this field. But the other possibility would be to say the relationship between a teacher and a student in a Catholic school is indeed ministerial in view of Our Lady. And so it's a little puzzling why you insist on it. I'm sure you did that, but you did it before Our Lady and the ministerial section had been defined fairly narrowly before that. But I'm not sure how we should treat what you're saying. Well, Judge Easterbrook addressed this in his concurring opinion in the Starkey case in the Seventh Circuit and pointed out that it's normal to address statutory issues before you address the Constitution. I mean, Judge King just authored an opinion in the Palmer case a couple months ago where you had a religious college that dismissed a teacher could have been a ministerial exception case. I think it's understood that Title VII is intended to implement the constitutional underpinning that's in the autonomy doctrine. I mean, it sounds to me like you're giving away issue after issue, but it's your argument and you go ahead and proceed. Well, Your Honor, I wasn't counsel below. I probably wouldn't have entered that stipulation, but we're abiding by the stipulation. I don't see a way that we can get around that. Well, I think to me your argument might be that we entered into that stipulation before Our Lady and that it may be broader and we don't want to foreclose that. That may be what you can say. I'm not arguing your case for you, but your take on it is interesting. We're abiding by the stipulation. But just to be clear, we would have to split with some other circuits because we would have to say this is a waivable defense. And there are several circuits that have said it's not to the defendant to tell us we can engage in an inquiry into the firing of someone who qualifies as a minister. That's something the Supreme Court has said we don't have the authority to do. I don't see how a party can waive that. Our position is you wouldn't have to reach the ministerial exception in this case because you could first address Title VII's religious case. Under our Palmer decision, as you mentioned, that would resolve this case without reaching a constitutional question. Exactly, and that's how courts normally operate. You don't reach out to Judge Widener here somewhere. He always asks about the Eichwander case. Exactly. What about Eichwander? You don't get to the constitutional question if you can resolve it on the statute. But again, there are several circuits. People do seem to treat the ministerial exception in Title VII differently, like in the companion case to Starkey, the Seventh Circuit. Maybe it was Starkey. The Seventh Circuit resolved it under the ministerial exception without reaching the Title VII question. Could have been the companion case. We would not be the first court to do that order of operations. And I think I understand that because the argument you're presenting under Title VII would require us to be within well-established understandings. I'm the biggest fan of the ministerial exception. My firm litigated Hosanna Tabor and Our Lady, and I'd be happy to argue that if that's what you want me to argue. It's your argument. I think the questions are pointing out that you are probably leaving behind very makeable arguments. And the question in this type of situation where the Title VII really is an implementation of sorts of the autonomy understanding, it seems to me that a court could start with autonomy or a court could start with Title VII. The normal provision, of course, is you defer on the constitutional issue. But here, the constitutional issue informs the statute, so to speak. And Judge Widener's picture, I don't think, is in this room. You're somewhere behind me. Right up here. We knew him well. I beg your pardon. And Judge Widener is here and is admonishing us. Well, I'll proceed in any order you wish. I'd be happy to argue the ministerial exception. We're asking questions. It's your argument. You design it the way you want. Great. I'd love to start with a plain text. All right. We can ask him. I'd love to start with the plain text of Title VII's religious exemption, which says Title VII shall not apply to a religious organization with respect to the employment of individuals of a particular religion. And I think we all agree that employment of individuals of a particular religion would include limiting your hiring to employees who share your religious beliefs. The question is whether that also extends to observances and practices. And Title VII defines religion to include not just belief, but all aspects of religious observance and practice. So when a religious employer makes an employment decision based on the employee's religious belief, observance, or practice, as is conceded here, Title VII's religious exemption applies. And what this court said in Kennedy was, quote, the exemption includes, quote, permission to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts. The district court's interpretation of the exemption that applies only to claims, certain types of claims of religious discrimination, cannot be squared with the text, can't be squared with the fact that the exemption applies to this subchapter, meaning the entire subchapter of Title VII, can't be squared with the definition of religion to include observance and practice, can't even be squared with the alien exemption in the same sentence of the statute, which is not limited to claims of national origin discrimination. I see a question about the textual argument under 702. That's what we're talking about, right? And I know because of Judge Easterbrook's concurrence, there's a lot of emphasis on this subchapter. But everybody agrees, right, that the scope of 702 is the same as the scope of the 703 of that language. So how much, do you know what I'm saying, how much weight can I put, if everyone agrees that these two exemptions mean the same thing, but only one of them uses that critical language about this subchapter shall not apply, how much weight can I put on that? How does that work? Well, Your Honor, 703 does use very similar language. It says, the first words are, notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice to do XYZ. So notwithstanding the ban on facial discrimination, notwithstanding the prohibition on- The text is not the same. It says it shall not be an unlawful employment practice to hire and employ employees of a particular religion. That seems slightly different to me. I mean, you're asking us to do a really close textual analysis, but the two provisions that are identical have different texts. So I'm just figuring out how to square all of that up. Yeah. I would say, notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice, means that if you're doing employment of individuals of a particular religion, that is not an unlawful employment practice, regardless of any other provision of this subchapter. That's a close textual reading of that provision. And so both, and there's, you may wonder why there are two exemptions, right, that have the same scope. When Congress originally enacted Title VII, the two exemptions had a different scope. The first exemption, 702, you had the employee, it was limited to employees who engaged in religious activities. Several members of Congress said, that's too narrow for religious schools. Religious schools need to be able to hire people of a particular religion for any position, whether or not they're engaged in religious activities. So that's why they added 703. It was broader. Then in 1972, Congress broadened the first one. So now they're the same scope, but that shows us that from the very beginning, Congress was particularly concerned about religious schools to make sure religious schools could hire individuals of a particular religion, regardless of what position that employee held. You also have the same language in the Americans with Disabilities Act, individuals of a particular religion. The district court's reading, plaintiff's reading, that this applies only to claims of religious discrimination, it makes complete nonsense of the exemption in the Americans with Disabilities Act, because there is no claim of religious discrimination under the Americans with Disabilities Act. You can only bring a claim of disability discrimination, and yet there's an exemption that says, this doesn't apply to giving preference and employment to individuals of a particular religion. So the only way to construe that is that that religious exemption can bar claims of disability discrimination, just like the Title VII exemption can bar claims of sex discrimination. This is also exactly how the Third Circuit interpreted the religious exemption in the Curry-Kramer case to bar a claim of sex discrimination. The Fifth Circuit in the Mississippi College case, and then I mentioned Judge Easterbrook in his concurring opinion in the Starkey case in the Seventh Circuit. So if you were to not go this direction, not adopt the plain language of the religious exemption, you would be creating a circuit split. That's not how I read those cases. I thought those cases were more about the sort of pretext problem, but I just want to put that to one side. Let me just tell you my concern about your argument. I mean, I think your case, the facts of your case, would strike a lot of people as sympathetic. You know, a teacher at a Catholic school engaged in conduct that seems to go to something like a core of the school's religious mission, but your legal argument, right, is not at all limited to facts like that. If we adopt this reading of Section 702, and tell me if I'm wrong, if there's some way to narrow it, but I think that would mean that the school could fire not only a teacher in a same-sex marriage, but also a custodian in a same-sex marriage, or a different school could fire the custodian for being in an interracial marriage if the school had an objection to that, a sincere religious objection, or if there was a school that didn't think women should be in the workplace for religious reasons, just fire all of its women employees. Is there any way, like, can we read 702 in any way that would narrow it to discrimination like this, or do we inevitably have to embrace all of it? Sure, there's a couple responses to that, Your Honor. So, with the question about the nature of the position, how far down the chain does it go, the Supreme Court answered that in Amos. It applied it to a building engineer, which is basically a janitor, so it does apply all the way down the chain. As to the type of discrimination involved, you mentioned interracial marriage. That claim would lose, the religious organization would lose that claim open and shut, not because of the text of Title VII's religious exemption, but because both Congress and the Supreme Court have treated race differently in three contexts. First, Section 1981, that prohibits employment discrimination, private employment discrimination based on race. There is no religious exemption in 1981. There's no 15 employer limit either. There's no cap on damages, so religious organization would be fully liable under 1981. I mean, at least as to your Title VII argument, you would still, I imagine, your expressive association claim would still kick in then, right? That would lose as well under the Supreme Court's decision in the Bob Jones case. So, that was the stripping of tax-exempt status under 501c3. Bob Jones University said, hey, that violates our autonomy, that violates our religious liberty. Supreme Court said, no, you lose because of the compelling interest. So, you're answering sort of a to construe Section 702 so that it would not allow this, right, on your reading. 702 would allow all forms of discrimination that had a religious motive. Yes, just like the 15 employer limit, but my point is that the concerns that have been raised, I'm sorry, that I should not worry about it because there may be other, they're fully addressed by other statutes. So, you had how far down the chain does it go? Does it apply to nasty things like race discrimination? And then there's another concern about what organizations are covered. I didn't raise that concern, but if you would like to address it, feel free. Things like hospitals. It has to be a religious organization. The Ninth Circuit has expressly ruled that hospitals are not covered in the World Vision case. So, that is very much an active issue. I mean, there are a lot of arguments about what should be covered and what shouldn't be covered. So, I don't think we can consider that sort of a stable area of the law. I'm sure you're more familiar with those cases than I am and the efforts to change federal regulations on that. I took your question to be, are there things out there that can limit this? And the answer is yes, and that's one of them. All right. I think you have some, you're through the red light and you have some time on rebuttal and we can take that up then. Thank you, Your Honor. All right, Mr. Block, you're on television. Everybody can see you. We'll hear from you. Thank you, Your Honor. Josh Block for the plaintiff, Lonnie Billard. I'll begin with this question of constitutional avoidance because I do think this is a critical issue here. In Rayburn, in the opinion authored by Judge Wilkinson, this court went to great lengths to say if it could avoid the constitutional question involved in the ministerial exception case, it would. It looked at the text of section 702 and at the legislative history and asked itself, is there any way we can construe section 702 to provide an exemption that would make it unnecessary for us to decide the constitutional question of the ministerial exception? And this court said no. That was before the Supreme Court had even acknowledged a ministerial exception. That was asking us to break new constitutional ground. And the court quite properly said, before we wade into an open constitutional question, we're going to look at the statute. I do think the situation is a little bit different. The Supreme Court has now twice acknowledged the ministerial exception. That's not new law anymore. The other stuff we're being asked to do today, that's new law. I completely agree with that, Your Honor. I'm just saying that this question of Ashwander, does constitutional avoidance apply? That's already been resolved. There is no way to avoid the constitutional question under the ministerial exception by interpreting section 702 to cover this. So I would strongly prefer the court resolve this on grounds that can be limited to the context of teachers at schools, as opposed to interpret section 702 in such a broad, sweeping fashion that, as Your Honor said, would apply to every single employee in the secular workforce of a religious organization. It's not true that hospitals aren't covered. Kennedy versus St. Joseph's was a hospice center, and in fact cited an Iowa case that involved a Catholic hospital. So as the amici from the National Women's Law Center pointed out, the implications of the section 702 argument are really sweeping. And the plain text of section 702 supports the plaintiff, not the defendants. Section 702 provides an exception with respect to employment of individuals of a particular religion. That phrase, individuals of a particular religion, didn't come out of nowhere. It was drawn from the underlying prohibition in section 703 on discrimination based on an individual's religion. Section 703 says it shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his employment because of such individuals' race, color, religion, sex, or national origin. Section 702 doesn't use the phrase religious discrimination, but section 703 doesn't use the phrase religious discrimination either. It has five separate prohibitions based on the individual's race, the individual's color, the individual's religion, et cetera. So when section 702 comes along and provides an exception with respect to employment of individuals of a particular religion, it's providing an exception with respect to the prohibition on discrimination because of an individual's religion. Defendants say that section 702 provides an exception to all five of section 703's prohibitions whenever an organization seeks to enforce its religious tenets. But when Congress wanted to create that exception, it knew how to do so explicitly. In 1972, the same year that the Congress passed Title IX, which has an explicit exception saying the statute shall not apply to a religious organization if it's inconsistent with the organization's religious tenets. The ADA referenced by my colleague has the same exception there, and the legislative history of the ADA goes out of its way to say we drew that religious tenets exception from Title IX, and there's no similar exception in Title VII. So Congress could have had a broad exception for religious tenets. It knew how to write that exception, but it chose not to. It had an exception based on employment of individuals of a particular religion and tracked that language with the underlying prohibition on discrimination because of an individual's religion. I'm happy to answer more of section 702, which I think is a critical argument here, but if there are no further questions on that, I can proceed to the constitutional point. I ask you to address your colleague was reassuring me that I shouldn't worry about the scope of the 702 exemption because there are other statutory protections that would kick in to protect employees of religious employers. Do you have thoughts about that? Well, I think that Congress passed section 702 to eliminate discrimination in the and Title VII has a variety of remedies that are very distinct from private lawsuits under section 1981. You don't have EEOC enforcement of section 1981 claims. I don't think you can say because there's some other statutes that might somehow get at this conduct that that means that there's no practical consequence to interpreting section 702 in a way that would effectively gut it for employees of all religious employers, not just hospitals. If you look at the amici that have lined up in support of defendants, they're from broadcasters, they're from charities, they're from accounting. Everyone wants to invoke the section 702 exemption more than just religious schools. And so I just think the sweeping effect of that interpretation can't be overstated. But at the same time, our opinion or excuse me, our argument doesn't rely on the practical consequences. It really does rely on the plain text, which is how every single court to interpret section 702 has interpreted it up until a year or two ago. And adopting defendants interpretation would very much create a circuit split with the Ninth Circuit in Pacific Press and in EEOC versus Fremont Christian. You know, Pacific Press was an employee who sued her employer in violation of the principle of Seventh Day Adventist that you shouldn't have lawsuits between members of the faith. There's no question that she had violated the religious tenets of her employer. And yet the Ninth Circuit said that section 702 doesn't provide an exception for that. And of course, the Ninth Circuit also held that principles of church autonomy don't either. But I think with section 702, there really is, you know, no other court of appeals that has adopted defendants argument. And I agree with your honor that Curry-Kramer is a case, that's not a case about the scope of section 702 really, it's a case about how courts can't answer ecclesiastical questions. Curry-Kramer never says section 702 allows religious employers to engage in sex discrimination. Curry-Kramer says that one particular sex discrimination claim couldn't proceed because adjudicating that claim would require the court to make an ecclesiastical judgment about the comparative severity of different doctrinal violations. It never says section 702 allows sex discrimination or race discrimination. And of course, you know, when in 1972, the idea that there could be schools that would discriminate on the basis of race was not a wild foreign concept, it was a reality. And so I don't think that we should ascribe to Congress a gaping hole in the structure of Title VII, especially when it's contrary to the plain text and all the legislative history we have. If there are no further questions on section 702, I'd be happy to address the constitutional arguments. With respect to the ministerial exception, you know, it is true that the two circuits in very cursory opinions have said that it's not waivable. The 11th Circuit has said that it is waivable. And I also think that there's a difference here between waiver and forfeiture. You know, this is a case in which defendants entered into a stipulation that they wouldn't rely on the ministerial exception. In exchange for that stipulation, lots of discovery into what my client's job duties were was taken off the table. We wanted discovery in a 30B6 witness who could talk about what his actual job duties were, and they couldn't provide one. And so instead, they entered into the stipulation. I think that it's a fact of life in litigation as any criminal defendant attorney or habeas practitioner can tell you that sometimes a party enters into a stipulation unwisely, doesn't raise a defense they could have raised, fails to anticipate a change in the law, and in other contexts, courts hold them to that stipulation or that waiver or that forfeiture. So I don't think that the fact that the legal landscape has changed since the stipulation was entered into means that they should be completely relieved of it. I mean, at a minimum, there should be additional, you know, discovery into whether the ministerial exception actually applies here. But in any event, I also think that under current law, as Justice Alito said in his concurrence in Hosanna-Tabor, a secular teacher at a religious school doesn't qualify for the ministerial exception. Defendants could have argued for an extension of the law. They could have argued for the ministerial exception to be extended to cover all teachers at an organization, right? But they haven't made that argument. And I think what's sort of dangerous about this case from a precedential standpoint is that these are an extremely unusual set of facts that are unlikely to occur in the future. In 2023, attorneys for religious schools have read Our Lady. They've read Hosanna-Tabor. They know that if they want to create a position that is central to the church's spiritual or religious mission, they know how to create a job description that does that. They know that if you assign teachers job duties that have a religious function or involve teaching religion, that employee is going to be insulated from Title VII under the ministerial exception. So we sort of have a time warp problem where we're talking about facts that occurred back in 2014 that religious schools can structure their employment positions however they see fit. And I would think it's highly unusual that you would have another case here where the record was so clear that a teacher had no religious duties. That's what discovery showed over and over and over again. And I think that I understand what the court has said about, on the surface, the idea that a church school can't fire a teacher for doing something that conflicts with their religious beliefs seems to bump up on ideas about how the ministerial exception has been expanding, how it might expand in the future. But I think it would be a big mistake to stretch other areas of the law to pick up the slack and make up the difference, because I think stretching other areas of the law has huge collateral consequences that extends far beyond the ministerial exception. As consistently in Rayburn and in EEOC versus Catholic Diocese of Raleigh said that when a job description has a spiritual function, the ministerial exception applies. But when job duties don't have spiritual functions, a church, like any other organization, has to comply with Title VII as a neutral and generally applicable law. Defendants say that that principle extends beyond ministerial employees, but all the cases they're citing, like Bryce and Moody, aren't cases about a church's autonomy over its internal structure. They're cases about how courts can't answer ecclesiastical questions. And what's doing the job in those cases is not that the employer made a decision for religious reason. It's that in order to adjudicate the specific claim, the court would have to make a judgment about the truth, falsity, or reasonableness of the religious belief at issue. And I think that the 28 J letters that were exchanged about the McMahon versus World Vision case are really clarifying here. Because I think McMahon supports our argument that there's no ecclesiastical question problem in our case. And we're not asking the court, no one's asking the court to decide that their motives were pretextual. We're saying their motives were irrelevant. And no one's challenging their speech about their religion. We're challenging the actions and firing them. So, yes, your honor. Let me ask you a question. You sort of seem to be limiting the holdings to ecclesiastical aspects, which I'm not sure how that's defined. But it appears from the record that not only the teaching, but the example and the conduct of teachers teaching Catholic children in the Catholic schools, or not Catholic children, but teaching children in Catholic schools, has a broader aspect than just teaching ecclesiastical, maybe religious doctrine or orthodoxy. It's a way of life and the children, the Catholic Church takes position that the conduct of the teachers is very informative and when a teacher sets an example of conduct that's contrary to the Catholic teaching, it seems to me that how you define ecclesiastical, that might be ecclesiastical or may not be, but it's important to the church. Yes, your honor. I think that the courts have been unanimous, the Third Circuit, the Fifth Circuit, other courts have all held that the fact that a Catholic school teacher is supposed to be a living example is not enough to make their employment an ecclesiastical concern. I think Justice Alito sort of softened the lines of the ministerial exception in Our Lady and didn't ultimately define it, but it comes down to a little bit of what's important to the indoctrination, the activities of the Catholic education, and of course the documentation in the record well supports a notion that this is very important to the Catholic Church as to the teachers who teach the children. Yes, your honor. I don't know what the lines are. I think it's hard to define lines, but yes, your honor, you know, teachers may be included and maybe the operator of the lawnmower might not be included, but a teacher is the one that's influencing the children, of course. But your honor, so I think the entire purpose of the ministerial exception is to draw that line, and so I think, you know, this court's precedents are very, very clear that on one side of that line is the ministerial exception and on the other side of the line is compliance with Title VII, and so it might be that in a future case the Supreme Court might hold that the ministerial exception applies to these circumstances. I think Justice Alito's concurrence and Hosanna Tabor suggested that it doesn't, but as a panel of this court, you know, this court is bound by and I don't think it can depart from its prior precedent in Rayburn, in Dole versus Shenandoah, based on an anticipation of how the law might change in the future. Remember, in Dole versus Shenandoah, oh, I'm sorry, Judge Harris. I don't judge Neimeyer. The question is sort of a, I've understood that the ministerial exception is an aspect of the autonomy doctrine, but that it's, the autonomy doctrine could be and is broader than the ministerial exception. You agree with that? I think that it is for other strains of the autonomy doctrine. The autonomy doctrine means many things. Can I ask a question just about the ministerial exception? I understand that this teacher was teaching, or that Mr. Billard was teaching only secular subjects, but does the record show that he was at least evaluated on whether he taught those subjects sort of consistent with Catholic doctrine? Your Honor, it's a little bit conflicting. The witnesses said that they did not want him to integrate Catholic teachings into his lessons, that they wanted secular teachers to stay away from Catholic teaching issues and leave that to the religious employers. It is true that some of the evaluation forms talked about Catholic values, but in a much broader sense. So we have very clear testimony about that. I heard show that he was evaluated on whether his teaching, I think the language was something like is agreeable to Catholic doctrine. Yeah. So I do wonder about this line between teaching religious subjects and teaching secular subjects if you have to teach secular subjects in a way that is consistent with Catholic doctrine. It seems like a fuzzier line than it might otherwise appear. Yes. Your Honor, I guess I would say if this court is inclined to rule based on some form of religious autonomy, I would much prefer the court fit into a ministerial exception bucket and then the court try to draw some other limiting principle. I think that having some other shadow principle of employees that are not ministerial employees, but are nevertheless sufficient to trigger church autonomy. I think that's a very hard line to draw. The ministerial exception is an objective test based on the employee's job duties. And so I think the question is if his job duties do trigger church autonomy, then he should be in the ministerial exception. But the actual employment policy here never claims to be limited to teachers. Defendants think that the doctrine of scandal applies to all employees, implies to the janitor, the lunch lady, the IT specialist. And so I think the same church autonomy arguments they're making, that their principle is whenever the church employer makes a personnel decision for a religious reason, church autonomy applies. That's an unlimited principle that applies to everyone. So if the choice is losing under a broader church autonomy or having the court, you know, relieve them of their stipulation and place substitute teachers in the ministerial bucket, I think the ministerial bucket is the much narrower grounds to decide in that a broader church autonomy holding has collateral consequences that will be very hard to anticipate. Now, it seems that the argument that whatever we were to do, if we were to address this issue, would open the floodgates. It seems to me it's belied by the facts of this case, which is number one, a teacher. Number two, whose conduct is contrary to the church doctrine and orthodoxy, and who recognized that when he announced his marriage, that he was going to be in trouble with the church. He understood that. So that's the limitation for this particular case. And a going down to the nutritionist and all the other people you're talking about is really not before us. I think what you're pointing out legitimately is where do we draw lines and how to draw lines and maybe facts, draw lines, a case by case approach, which is, of course, the common law tradition. But anyway, I've taken you past unless you have some response. Yes. I'd just like to just briefly respond. I think that the line that your honor articulated is a line for the ministerial exception. I think that your honor has articulated the reasons for saying that someone with the job duties of a teacher is a minister, and that's an objective test. My concern is about drawing different lines under some criteria that we haven't yet come up with. The lines that the court mentioned are administrable, but they're administrable because they are the triggers for the ministerial exception. All right. Thank you. Oh, yeah, go ahead. To sum up, it's your position that Judge Cogburn got it right? Judge Cogburn got it right? That's your position. My position is absolutely he got it right. But my position is that if we... That's right. To us rule in your favor, we need to rule in your favor on the two statutory defenses and the two constitutional claims. Correct? Yes. That's correct, your honor. Intervening authorities don't have any impact on it. Which authorities, your honor? The intervening authorities over this period of time that this case has been lingering around don't have any impact on what Judge Cogburn ruled. Well, I think Judge Cogburn, he issued his decision, I think it was 18 months ago. So I think a lot of those authorities had already been decided. I don't think that other cases like 303 Creative affect it. But we're defending the decision below and think it should be affirmed. But if we have to lose, I'd rather lose on the ministerial exception than on a different issue. Because I think... Is that right? I'm sorry, your honor. I would very much not want to lose on Title VII. That would be something I would want to release on. We got to reach constitutional question. You don't want to lose on Title VII. Yes, your yes, your honor. I think holding on Title VII is not an error holding. All right. I think we've gone through our red light. Why don't we hear from Mr. Goodrich. Thank you, your honor. A couple quick points. But I'd like to start where Judge Niemeyer just laid out. This is a this is a teacher in a religious school who violated a core church teaching. And everyone agrees that was the reason for the employment action. And my question is, how many Court of Appeals or Supreme Court cases have ever held that a religious school could not let go of a teacher in that situation? The answer is zero. But my concern about your argument, I totally understand that, is that it's like you've given us four blunt instruments to attack a really narrow problem. And I agree with your colleague, it is unlikely to recur because most of these cases are going to be resolved under the ministerial exception. And you have given us, I can't find of all your four arguments, anything that is sort of narrowly tailored to the facts that you want to keep putting in front of us. Because I do understand that many people would find them quite sympathetic and probably be of the view that the Supreme Court is going to think you can't you can't make a Catholic school retain this teacher. But none of the tools you're giving us gets at that problem. They are all much broader than that. The thing that gets at that problem is the ministerial exception. So I feel like I'm being kind of boxed into sort of a fake case here. We have no objection whatsoever if the Court wants to relieve us of the stipulation and rule that Billard was a minister. There's plenty of evidence in the record that would allow you to do that. The fact that he was required to start classes with prayer and did, was required to model the faith, was required to, and was evaluated on whether he taught drama in accordance with Catholic teaching. If you want to rule on the ministerial exception, we will gladly embrace that. However, the point of- You want us to change the facts? Pardon? You want us to change the facts of the case? No, Your Honor. I'm saying on the undisputed facts on this record, you could reach that conclusion if you desire. My point about the teacher in the religious school, that no court has ever done what the plaintiff is asking you to do, is that there are multiple areas of the law that converge to say that the Church is protected here. Certainly, the ministerial exception is one of those, and that is the most common way that courts have typically handled these issues. But there's no need or constitutional warrant to try to stretch the ministerial exception to cover every one of these situations that arises when there are multiple doctrines that cover this, and it should be no surprise that there are. And as to whether those doctrines are blunt or narrow, I'd love to briefly speak to each one. Title VII- The difficulty is the ministerial exception has an object. In other words, basically what's at issue is the orthodoxy of the Church and its insistence that teachers' conduct conform to orthodoxy. And your reluctance to embrace the ministerial exception is really unfortunate, especially in view of the Supreme Court's decision in R-80. It's the most focused doctrine that's been advanced, I think. Maybe I'm wrong. Maybe we should read 703 and see what's at issue. But we don't have a silver bullet. You have five silver bullets, basically, and we have no objection to the ministerial exception. But to the narrowness of the other pieces, the Title VII religious exemption, in the vast majority of cases, it's not- And Title VII wrote what? Religious exemption. The Title VII exemption isn't going to apply in the vast majority of cases. Take Palmer for an example. If you dismiss a teacher because she's not up on technology, if you dismiss a teacher because you just don't like the personality, or budgetary reasons, we're making budget cuts, the religious exemption doesn't even come into play. And that's the vast majority of employment decisions that are made. Second, if you do assert that we made this employment decision based on the employee's religious belief, observance, or practice, that still has to be the genuine reason. If that's a pretext, if that's a sham, if it's made up, the religious exemption doesn't apply. So you would disagree with all the cases that say, no, if a religious school asserts a religious reason, and it would require an intrusive inquiry to figure out whether that reason is pretextual or not under 702, we have to stand back. Those cases are wrong? No, our position is some pretext inquiries are allowed, and some are not. And I'd be happy to explain which ones. Okay. So. Unless you have anything further to wind up, you are through the red light. Thank you. I would just note that the Supreme Court in Obergefell anticipated this sort of case and promised that religious organizations would continue to receive legal protection as they teach their belief in traditional marriage. This case falls squarely within the promise of Obergefell, falls squarely within the text of Title VII's religious exemption and the First Amendment. So we ask that you reverse. Thank you. Thank you. We'll come down and greet counsel and then proceed on the next case. Mr. Block, we can't shake hands with you in reality, but it's our tradition and we've resumed it. I'm sorry about your physical condition. I hope you recover quickly. But thanks for your argument and we'll greet you in this manner from the bench. Thank you.
judges: Paul V. Niemeyer, Robert B. King, Pamela A. Harris